Iri R. Cope and Marcella S. Cope, et al. [1] v. Commissioner. Cope v. Commissioner
Docket Nos. 34098-34100.
United States Tax Court
1953 Tax Ct. Memo LEXIS 76; 12 T.C.M. (CCH) 1258; T.C.M. (RIA) 53350; October 30, 1953
Zolman Cavitch, Esq., and M. R. Schlesinger, Esq., for the petitioners. Robert E. Johnson, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in the income taxes of the petitioners for the calendar years and in the amounts as follows: Docket No.
Year
Deficiency
34098
Iri R. Cope and Marcella S. Cope
1946
$ 3,223.92
34098
Iri R. Cope and Marcella S. Cope
1948
3,817.94
34099
Iri R. Cope and Marcella S. Cope
1949
1,897.62
34100
Iri R. Cope
1947
4,414.29
*77 Issues arising from the respondent's determinations are the correctness of his action (1) in disallowing deductions taken in 1946, 1947, 1948 and 1949 for farm losses; (2) in determining that a gain realized on the sale of certain cattle in 1949 was not capital gain; (3) in determining that income received from Cope, Inc., in 1949 had been omitted by petitioners from their return for that year; (4) in disallowing a deduction taken in 1947 for medical expenses and in disallowing a portion of the deductions taken in 1948 and 1949 for such purpose; and (5) in failing to allow credit for income tax paid for 1947. The petitioners have conceded issue No. (5). By amended answers the respondent has moved to increase the deficiency for 1946 from $1,824.92 to $3,223.92, that for 1947 from $2,477.13 to $4,414.29, and that for 1948 from $1,707.10 to $3,817.94 on the ground that the petitioners received additional income in those years which was not reported. General Findings of Fact A portion of the facts have been stipulated and are found accordingly. Other facts are found from the oral evidence. The petitioners are husband and wife residing at 13705 Shaker Boulevard, Shaker Heights, *78 Ohio. They filed joint income tax returns for 1946, 1948, and 1949 with the collector for the 18th district of Ohio. Iri R. Cope filed an individual and an amended individual income tax return for 1947 with the collector for the 18th district of Ohio. Iri R. Cope is referred to hereinafter as the petitioner because the issues to be decided relate solely to him. Issue 1. Farm Losses Findings of Fact In November 1941, the petitioner purchased 122 acres of land situated off Route No. 91 in Chagrin Falls, Ohio, approximately twenty miles southeast of downtown Cleveland. He had no experience in farming at the time of the purchase. Before purchasing this farm, petitioner looked at several farms within a twenty-five to thirty mile radius of Cleveland. His choice narrowed down to the farm he purchased and a hog farm. He decided against the hog farm. The property purchased, containing a farmhouse and a barn, cost $8,216.90 and was located in a farming area, not in an area of country estates. In August 1942, the farmhouse, together with 12 acres of land, was sold by the petitioner for $3,500, leaving 110 acres of land which petitioner retained throughout the taxable years here involved. *79 This land had not been worked and operated as a farm for 20 years prior to petitioner's acquisition. Petitioner made various improvements to the farm in 1942, which included the building of a barn, a corral, fences and troughs, and a new road from the highway to the new living quarters, at an aggregate cost of $11,338.64. During the same year he purchased various farm machinery and equipment at an aggregate cost of $1,982.99. In each of the subsequent years, through and including 1949, petitioner made further improvements to the farm, including the building of an additional barn and fences. During the same period, he purchased additional farm machinery and equipment. At the beginning of the calendar year 1946 petitioner's total investment in the farm, adjusted for depreciation, was $19,750.33. At the end of each of the years 1946 through 1949 petitioner's total investment in the farm, adjusted for depreciation, was as follows: 1946
$ 23,663.48
1947
23,747.37
1948
23,763.65
1949
24,032.81
After the sale of the farmhouse and 12 acres, the only living quarters on the farm were located in a barn, constructed by petitioner in 1942, and occupied the area which had *80 been set aside originally for the hayloft. These quarters consisted of a living room, kitchen, bath, 2 bunk rooms, and an unheated bedroom, all of which occupied a total floor area of approximately 1,000 square feet but which furnished considerably less headroom because of the peaked roof construction. The quarters were constructed with beaver board and materials salvaged from the demolition of the old barn which was located on the land when petitioner purchased it. Petitioner had originally converted the hayloft of the barn to be used by a permanent farm manager, but it was never so used because he could not hire a manager in the early years and when he subsequently hired Walter Haggard, he made his home with his brother who lived a quarter of a mile away. The living quarters were used by petitioner and his family when they came to the farm to work in the summer, early fall and on week ends. Occasionally, two or three times a year, petitioner would invite customers to the farm for a picnic or steak roast. No guests ever stayed on the farm overnight. In January 1942, petitioner ordered two carloads of steers. At that time petitioner had no steady farm help and consequently had *81 to do most of the work himself. Shortly thereafter, the price of beef was frozen and he sold most of the cattle in 1943 at a profit of $1,662.06. In the spring of 1943, petitioner and his children set out 10,000 tomato plants, having previously received a commitment for the sale of all the tomatoes he could grow from Jack and Heintz Co. In July, the worst cloudburst in many years washed 90 per cent of the tomato plants into the river. That summer tomatoes hit an all-time high, but petitioner only realized $394.91 from the remaining crop. In the fall of 1943, with the price of pork still going up, petitioner bought six brood sows. Just before their litters were born, cholera developed and most of the sows had to be destroyed. In the spring of 1944, petitioner planted 30 acres of corn and 30 acres of potatoes. Petitioner planted the potatoes because the county agent had advised him that his land was suited primarily for potatoes. An unusually wet season rotted the potatoes in the ground. Walter Haggard, sometimes hereinafter referred to as Haggard, was hired as a permanent farm manager in 1945, because petitioner had to devote more time to Cope, Inc., which was engaged in packaging *82 for the Army Ordnance Department. In 1946, petitioner planted 60 acres in corn and soybeans, which were used for feed, and sold 10 pigs and 6 head of cattle. Petitioner also built a new, modern barn in 1946 with runways down one side for cattle and runways down the other side for hogs. In the spring of 1947, he purchased some sows and a boar and eight thoroughbred Black Angus cows and a bull. He also planted 60 acres of crops for feed. Later that year the pigs became diseased and most of them had to be destroyed. In the fall of 1949, ragweed destroyed an entire 30-acre crop of soybeans that petitioner was growing for feed. Of the 110 acres of land in petitioner's farm, 50 acres were pasture land and 60 acres were suitable for cultivation. The latter 60 acres were never left idle by petitioner. Petitioner devoted those 60 acres principally to raising corn and/or soybeans as feed for his livestock and occasionally he devoted some of his acres to raising crops for sale, for example, his ill-fated venture in 1943 of raising tomatoes for sale. Petitioner also had two horses on the farm which were acquired primarily for use in handling the cattle and for draft purposes. They also *83 were used for recreational purposes. The expenses of the farm for the years here involved consisted of wages for additional farm help, cost of feed purchased, cost of repairs to machinery and equipment, veterinarian fees, gasoline and other fuel for farm business, electricity and telephone expense, and depreciation. The petitioner had cancelled checks for his disbursements and maintained a bank account. Petitioner's income tax returns from 1942 to 1949, inclusive, indicated the following losses claimed, expenses, depreciation and gross profits in each year following 1941 when the farm was acquired: Year
Loss Claimed
Expenses
Depreciation
Gross Profits
1942
$ 7,786.36
$ 7,343.81
$ 442.55
1943
5,831.34
6,931.77
956.54
$ 2,056.97 (a)
1944
3,754.11
2,691.05
1,063.06
1945
5,986.86
4,918.70
1,068.16
1946
3,349.73
3,178.69
817.09
646.05 (b)
1947
3,119.76
2,201.55
918.21
1948
3,229.19
2,455.83
952.50
179.14 (c)
1949
1,437.07
2,546.64
985.75
2,095.32 (d)
Total
$ 34,494.42
$ 32,268.04
$ 7,203.86
$ 4,977.48
*84 Petitioners operated the farm as a business in the pursuit of profit during the years 1946 through 1949, inclusive. Opinion The first issue is whether the petitioner carried on a farm operation for the purpose of making a profit. [2] Petitioner contends, in the alternative, that if it is found that the farm was not operated to make a profit, then the farm directly benefited him in deriving profit from his trade or business as executive officer of Cope, Inc. Respondent contends that petitioner had no intent to operate the farm as a business for the purpose of making a profit. In support of this contention, respondent states there were eight years of continual losses, few sales of produce and *85 livestock in four of the eight years and no sales in the remaining four years; petitioner had no previous farming experience; petitioner and his family lived on the farm in the summer; petitioner had steak roasts and picnics on the farm; petitioner had two horses on the farm which were used for recreational purposes; petitioner sold all his cattle after respondent's agents advised him that his farm losses were not deductible; petitioner devoted his major effort to Cope, Inc.; and petitioner kept few records for the farm. The petitioner and the respondent are in agreement that this issue is to be determined on the basis of the petitioner's intent as shown by all of the facts. Norton L. Smith, 9 T.C. 1150. We do not agree with respondent that petitioner ran the farm for purposes of pleasure. Continual losses suffered by petitioner from 1942 through 1949 are not determinative of this issue, where an intent to realize an eventual profit is shown, Hamilton F. Kean, 10 B.T.A. 97. The failure of petitioner to realize income in some years was due to the many misfortunes that plagued him and not to any lack of effort on his part to carry on a profitable farm enterprise. *86 The lack of farming experience can not be held against him, as the only way he could obtain such experience would be to make an investment in a farm and begin farming. The living quarters on the farm were unpretentious and utilitarian, used only when petitioner and his family worked on the farm. It is true that two or three steak roasts or picnics were held on the farm but this fact does not indicate the farm was owned primarily for pleasure purposes, as it is entirely reasonable that one may own a farm for the purpose of deriving a profit and yet occasionally make use of it for pleasure. Thomas F. Sheridan, 4 B.T.A. 1299. The horses on the farm were acquired for use in handling the cattle and for draft purposes. The fact that they were also used by petitioner's children for recreation would not alter the original purpose for which they were acquired. Laura M. Curtis, 28 B.T.A. 631. The fact that petitioner had another occupation is of no significance, as Regulations 111, Section 29.23(e)-5, contemplates that a farm may be operated as an additional business of the taxpayer. Nor are we able to see how a lack of farm accounts and records shows petitioner did *87 not operate the farm for a profit. The only records he was required to keep would be those needed to reflect his true income. He had cancelled checks for his disbursements and maintained a bank account. The returns submitted at the trial contain detailed depreciation schedules which indicate to us he must have maintained some records. The fact that petitioner sold all his cattle when respondent's agents told him his farm losses were not deductible does not indicate petitioner had no reasonable hope of deriving a profit, but simply indicates petitioner did not wish to risk any more of his capital in farming. A consideration of the entire record indicates strongly that the petitioner's sole purpose in owning and operating the farm was to realize a profit therefrom. He started in 1942 by stocking the farm with 110 steers that cost $7,896.90. Subsequently, the price of beef was frozen and he decided to sell the cattle and realized a profit of $1,662.06 in 1943. In the spring of 1943, having received a commitment from Jack and Heintz Co. for the sale of all the tomatoes he could grow, he and his children set out 10,000 tomato plants, only to have the worst cloudburst in many years wash *88 away 90 per cent of his crop. Petitioner realized only $394.91 from the entire crop of tomatoes. In the fall of 1943, petitioner purchased six brood sows and made plans to go into the hog business. Just before the litters were born, cholera developed and most of the sows were destroyed. In 1944, petitioner had the county agent test the soil. Tests showed the soil was sandy and good for raising potatoes. Thirty acres of potatoes were planted and 30 acres of corn. The potatoes rotted in the ground because of an unusually wet spring and were absolutely useless. In 1945, petitioner hired Walter Haggard as farm manager because he had to spend more time at Cope, Inc., and he wanted an experienced farmer. That year they raised corn and soybeans. A new barn was built in 1946 and the crop of corn and soybeans was used as feed for the cattle and hogs. Petitioner also sold seven shoats, six beef cattle and three sows. In 1947, eight Black Angus cows and a bull were purchased with the intention of developing a breeding herd. Petitioner also bought some sows and a boar, but they too developed cholera and had to be destroyed. Eight Black Angus calves were born in the spring of 1948. During 1949, *89 six more calves were born, a good corn crop was raised, but 30 acres of soybeans were damaged by ragweed. Petitioner has endeavored from the beginning to operate the farm on a profitable basis by changing from one type of farming to another when it became apparent the one or the other type of operation was not going to produce a profit. Petitioner personally worked at the farm handling cattle, planting and aiding in the harvest and doing other chores, which could hardly be called recreation. On the entire record we conclude the farm was operated for profit and that the Commissioner erred in denying the deduction for the losses sustained in 1946, 1947, 1948 and 1949. Issue 2. Sale of Black Angus Cattle Findings of Fact Petitioner in the spring of 1947 purchased eight head of Black Angus cows and a bull for $1,200. These Black Angus cattle were beef producing cattle and when purchased no registration papers or pedigrees were furnished by the seller. In January 1948, eight calves were born of the original nine Black Angus, but two of the calves died. In January 1949, six more calves were born of the original nine Black Angus. The approximate gestation period of a Black Angus cow *90 is 9 months. None of the calves born on petitioner's farm ever gave birth to calves during the time held by petitioner, nor were any of them ever bred. On September 28, 1949, petitioner sold two Black Angus bull calves, born in 1948, together with two head of cattle of another type, realizing thereby a gain of $448.21, all of which was ordinary income and reported as such in petitioner's income tax return for that year. On November 17, 1949, petitioner sold the original 9 Black Angus and remaining 10 calves to a farmer in Olmsted Falls, Ohio, at the current price per pound for prime beef cattle on that date as published in the newspapers. He received therefor a total of $2,276.91. The gain realized from this sale was reported by petitioner as ordinary income. Petitioner had no record of the sex of the Black Angus calves included in the sale. Petitioner had never advertised his cattle for breeding purposes. The only breeding record kept by Haggard was on the inside of the barn door, showing when the cattle were bred and when the calves were born. Opinion The gains reported by petitioner from the cattle sales made in September and November 1949 were reported by him as ordinary income. *91 The respondent has made no change in that classification of the gains. The parties have stipulated that the gain of $448.21 realized from the sale in September 1949 is taxable as ordinary income. The petitioner contends that the gain realized from the sale made in November 1949 is capital gain. The determination of the correctness of that contention depends on whether the cattle sold in that month were "property used in the trade or business" within the meaning of section 117(j)(1) of the Internal Revenue Code, which provides, in part, as follows: "Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding or dairy purposes, and held by him for 12 months or more from the date of acquisition". [3]
The cattle sold in November 1949 consisted *92 of the 9 head originally purchased by petitioner and the 10 head which had been produced on his farm. Clearly the nine head had been held and used by the petitioner for upwards of two years for breeding purposes. Consequently they were capital assets. As for the 10 head which had been produced on petitioner's farm, it is also clear that none of them had ever been bred even though some of them were approximately 22 months old. The petitioner urges that it is immaterial whether they had been bred since the determining factor is whether they were held for breeding purposes. Whether they were held for breeding purposes is a question of fact and the petitioner has the burden of proving that fact. The Diamond A Cattle Co., 21 T.C. - (Oct. 9, 1953). The evidence relied on by petitioner to sustain his burden consists solely of his statement that all of those cattle were held for such purpose. The record fails to support petitioner's position. None of the cattle had been bred and no showing is made as to what age cattle of the Black Angus breed are usually bred. Nor is there any showing as to the age petitioner expected them to reach before he bred them. So far as shown those born in 1948 *93 may have passed the age at which cattle of that breed are usually bred and those born in 1949 may have been sold before reaching that age. In view of this and since petitioner sold those born in each of the years at the current price per pound for prime beef cattle, we can not find that such cattle were held for breeding purposes. The record does not show what portion of the selling price of $2,276.91 was received for the cattle originally purchased or for those produced on the farm. However, petitioner expressed the opinion that the value, as prime beef cattle, of those originally purchased was less than their cost of $1,200 in the spring of 1947 since the price of beef had declined in the meantime. Since the cattle originally purchased were capital assets and in the absence of any other basis for an allocation or apportionment of the selling price between the two groups, we hold that 9/19ths of the selling price is to be treated as received from the sale of capital assets. The remainder of the selling price was ordinary income. Issue 3. Additional Income Not Reported Findings of Fact In determining the deficiency for 1949 the Commissioner included as additional income $3,015.96. *94 This additional income consists of $2,015.96 salary and social security taxes thereon paid to Walter Haggard by Cope, Inc., and $1,000 travel expense disallowed as a deduction to Cope, Inc. By amended answers respondent has moved to increase the 1946 deficiency from $1,824.92 to $3,223.92 by alleging the petitioners received additional income of $2,496 in the furtherance of their personal activities and increased the 1947 deficiency from $2,477.13 to $4,414.29 by alleging the petitioner, Iri R. Cope, realized additional income by Cope, Inc., paying out the following sums in furtherance of his personal activities: Salary and wages to domestic
employees of I. R. Cope
$ 2,128.00
Employer's social security taxes on
$ 2,128.00
21.28
Personal parking violation penalty
2.00
Reimbursement for personal entertainment
250.00
Reimbursement for personal travel
1,000.00
Total
$ 3,401.28
He also increased the 1948 deficiency from $1,707.10 to $3,817.94 by alleging the petitioners realized additional income by Cope, Inc., paying out the following sums in furtherance of Iri R. Cope's personal activities: Salary and wages to domestic
employees of I. R. Cope
$ 3,116.00
Employer's social security taxes
on $ 3,116.00
31.16
Reimbursement for personal travel
1,000.00
Reimbursement for personal
entertainment
200.00
Total
$ 4,347.16
*95 The items of $2 and $250 set forth by respondent's answer are stipulated to be income received by petitioner, Iri R. Cope, in the calendar year 1947. The item of $200 set forth by respondent's amended answer is stipulated to be income received by petitioner, Iri R. Cope, in the calendar year 1948. Throughout the period 1946 to 1949, inclusive, and for many years prior thereto, petitioner was president and executive manager of Cope, Inc., a corporation engaged in the business of creating and executing ideas for the promotion of sales of its clients' products, such as those of the General Electric Co., General Tire and Rubber Co., Iron Fireman Manufacturing Co., Patterson-Sargent Paint Co., and others. Although it employed a staff of approximately fifty persons, petitioner was the key man in the corporation. All sales promotion ideas originated with him. He alone sold all of the ideas and products produced by Cope, Inc. Cope, Inc., also engaged in packaging for the Army Ordnance Department during the war as its plant facilities were adaptable to such services. In 1945, as a result of his farm experience, petitioner conceived the idea of publishing a magazine containing digests of *96 the most interesting and important farm articles from other publications. He intended the idea as a sales promotion project for General Electric Co., one of Cope, Inc.'s clients, but the General Electric Co. never bought it. In 1947 Cope, Inc., sold the idea to the General Tire and Rubber Co. Beginning with its first edition early in 1948, Cope, Inc., published Farm Digest once every two months for the General Tire and Rubber Co. through and including the calendar year 1949. Farm Digest was a trade magazine patterned after Readers Digest and devoted to the problems of farming and farmers. The salary of Walter Haggard, manager of petitioner's farm, was paid by Cope, Inc., in each of the years 1946 through 1949. The respondent asserted, for the first time, in his answer to the petition that all of Haggard's salary for the year 1946, and all except $500 of Haggard's salary for each of the years 1947 and 1948 was taxable income to petitioner. For the year 1949, the respondent asserted in his income of deficiency that all except $500 of Haggard's salary was taxable income to petitioner. Haggard's salary for the year 1946 was $2,496, all of which is involved in this proceeding. For the *97 year 1947, Haggard's salary was $2,064 and the social security taxes thereon were $20.64, of which amounts $1,579.64 is involved in this proceeding. Haggard's salary for each of the years 1948 and 1949 was $2,496 and the social security taxes thereon in each year were $24.96, of which amounts $2,015.96 is involved in this proceeding for each of those years. During the years 1947 and 1948, petitioner maintained several servants in his apartment - a nurse for his wife who was an invlid, a chauffeur, a cook and a laundress. The only such servant whose wages were paid by Cope, Inc., was the cook, Juanita Stepps. The respondent asserted, for the first time, in his answer to the petition that the wages of Juanita Stepps and the social security taxes thereon which were paid by Cope, Inc., in the years 1947 and 1948, were taxable income to petitioner. The amount of those wages and taxes for the year 1947 was $569.64 and for the year 1948 was $1,131.20. Petitioner realized $488.26 additional income in 1947 and $969.60 in 1948 as a result of Cope, Inc.'s paying the wages of Juanita Stepps. Petitioner traveled extensively for and on behalf of Cope, Inc., because the home offices of many *98 of Cope, Inc.'s clients were located outside of the Cleveland area. At the end of every month, or immediately after a particularly long and expensive business trip, petitioner presented a voucher of his expense to Cope, Inc.'s bookkeeper and received reimbursement therefor. The entire amounts of such reimbursements were added to the cost of services supplied by Cope, Inc., to the respective clients for which such expenses were incurred. Accordingly, Cope, Inc.'s clients were, in effect, billed for such reimbursements. In its income tax returns for 1947, 1948 and 1949, Cope, Inc., claimed the following amounts as travel and entertainment deductions: 1947
$ 10,540.40
1948
10,594.90
1949
11,085.51 In examining said income tax returns of Cope, Inc., the respondent allowed all but $1,000 of the aforesaid claimed deductions in each of the years 1947, 1948 and 1949. The $1,000 disallowed in each of said years is asserted by the respondent in this proceeding to be income to petitioner, Iri R. Cope. The travel expense issue was raised by the respondent, for the first time, for the years 1947 and 1948 in his answer to the petition. Opinion The respondent by an *99 affirmative allegation in its answers for the years 1946, 1947 and 1948 stated that the amounts of $2,496, $1,579.64 and $2,015.96, respectively, paid by Cope, Inc., to Walter Haggard, petitioner's farm manager, constituted income to the petitioner. Respondent, therefore, has the burden of proof on this issue for these years. For the year 1949, respondent asserted in the notice of deficiency that $2,015.96 was taxable income to petitioner. Respondent contends that the payments by Cope, Inc., relieved petitioner of paying Haggard's salary and were taxable income to petitioner. Petitioner contends that Haggard rendered services to Cope, Inc., in the publication of Farm Digest. Petitioner also contends that if Haggard's salary was income to petitioner, it was deductible in computing the farm loss, or as an expense incurred by petitioner as an executive of Cope, Inc. Having decided that petitioner was conducting the farm with the intention of making a profit, it is unnecessary to decide this issue as even if we were to hold the salary to be income to petitioner, it would be deductible as an expense of the farm. The issue is eliminated by our prior holding. Respondent contends that *100 the amounts paid to Juanita Stepps by Cope, Inc., were not an expense of the corporation and should be treated as compensation to petitioner who was its president and owned 90 per cent of its outstanding stock. The record shows that petitioner's wife had been an invalid for 25 years; that petitioner had hired a chauffeur, nurse and laundress in addition to the cook; and that customers of Cope, Inc., were entertained at his home on week ends. Petitioner contends that respondent has not sustained the burden of proof on this issue, or if the amounts were income to petitioner, they were deductible by him in arriving at net taxable income because they were expenses incurred by petitioner incident to his trade or business as executive officer of Cope, Inc. While it can not be denied that petitioner entertained customers and amounts expended for entertainment would not be income to him, it is also true that the cook performed services of a personal nature to petitioner and his family while working at the apartment. These personal expenses are not deductible, see section 24(a)(1) of the Code. [4] We, therefore, have found that of the amounts paid to Juanita Stepps $488.26 was additional *101 income to petitioner in 1947 and $969.60 was additional income to petitioner in 1948. The last issue is whether the amounts received by the petitioner from Cope, Inc., in 1947, 1948 and 1949 as reimbursements for traveling expenses paid by him were taxable income to him to the extent of $1,000 each year. The burden of proof is on the respondent for the years 1947 and 1948 as the issue was raised in those years by an affirmative allegation in the answers. The burden of proof for 1949 is on the petitioner. The petitioner traveled extensively for and on behalf of Cope, Inc., because its clients were located outside of Cleveland, and at the end of every month, or immediately after a long and expensive trip, petitioner would present a voucher of his expenses to the bookkeeper and receive reimbursement. The expenses of the trips in the amounts for which petitioner had been reimbursed was added to the cost of services to the clients *102 of Cope, Inc. Respondent contends that it is unrealistic for petitioner to charge all of his traveling expense to Cope, Inc., and to claim that no traveling expenses were personal on the ground that his wife was physically incapable of traveling and entertaining. The respondent has not sustained the burden of proving $1,000 in 1947 and 1948 was income to petitioner. As to 1949, petitioner has stated he did no traveling other than for business purposes since his wife was an invalid. He submitted itemized vouchers at least once a month for all traveling expenditures which were substantial. The costs of these expenses were borne by the clients of Cope, Inc. We, therefore, conclude that the $1,000 added by respondent to petitioner's income for 1949 was not in fact income to the petitioner. Issue 4. Medical Expenses Opinion For the purpose of computing the deficiency, if any, under Rule 50, the parties stipulated that the petitioners paid medical expenses as follows: 1947
$ 1,263.87
1948
2,890.13
1949
2,149.67
Effect will be given to this stipulation in the Rule 50 computation. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Docket No. 34098 Iri R. Cope and Marcella S. Cope [Husband and Wife] Docket No. 34099 Iri R. Cope and Marcella S. Cope [Husband and Wife] Docket No. 34100 Iri R. Cope.↩
(a). Produce $394.91, Livestock $1,662.06 (105 steers) ↩
(b). 7 Shoats, 6 Beef Cattle, 3 Sows ↩
(c). 7 Swine ↩
(d). Swine $570.20, Cattle $1,525.12↩
2. Regs. 111, Sec. 29.23(e)-5. Losses of Farmers. - Losses incurred in the operation of farms as business enterprises are deductible from gross income. * * * If an individual owns and operates a farm, in addition to being engaged in another trade, business, or calling, and sustains a loss from such operation of the farm, then the amount of loss sustained may be deducted from gross income received from all sources, provided the farm is not operated for recreation or pleasure. * * *↩
3. Section 117(j)(1)↩, as here set out, contains amendments made thereto by section 324 of the Revenue Act of 1951. By the provisions of section 324 the holding period for livestock for taxable years beginning prior to January 1, 1951, remained at 6 months or more. The holding period of 12 months or more for livestock was made applicable to taxable years beginning after December 31, 1950.
4. SEC. 24. ITEMS NOT DEDUCTIBLE. (a) General Rule. - In computing net income no deduction shall in any case be allowed in respect of - (1) Personal, living, or family expenses, except extraordinary medical expenses deductible under section 23(X);↩